# In the United States Court of Federal Claims

No. 19-1805C
Filed Under Seal: October 16, 2020
Reissued: October 26, 2020*

| | |
|---|---|
| **SAVANTAGE FINANCIAL SERVICES, INC.,** <br><br> *Plaintiff,* <br><br> **v.** <br><br> **UNITED STATES,** <br><br> *Defendant.* | Keywords: Pre-Award Bid Protest; Cross-Motions for Judgment on the Administrative Record; RCFC 52.1; Motion to Dismiss; Competition in Contracting Act; Unduly Restrictive Requirements; Prejudice |

*Stephen M. Ryan*, McDermott Will & Emery LLP, Washington, D.C., for the plaintiff, with whom was *Llewelyn M. Engel*, McDermott Will & Emery LLP, Washington, D.C., of counsel.

*William J. Grimaldi*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant, with whom were *Rose J. Anderson*, Deputy Associate General Counsel; *Charlene T. Storino*, Assistant General Counsel; *Christine C. Fontenelle* and *Pavan Mehrotra*, Attorney Advisors, Department of Homeland Security, Washington, D.C., of counsel.

## MEMORANDUM OPINION

***HERTLING*, Judge**

Before the Court is the latest chapter in a dispute dating back to 2007 between the plaintiff and the defendant over the effort to modernize the financial-management systems of the Department of Homeland Security ("DHS"). This case presents a pre-award bid protest by Savantage Financial Services, Inc. ("Savantage") of the procurement by DHS of integrated financial-, asset-, and procurement-management software.

The plaintiff alleges that the defendant, the United States, through DHS, has acted illegally in two respects in the solicitation for the current iteration of the procurement. First, the plaintiff claims that DHS acted arbitrarily and capriciously in procuring software licenses and

---

* Pursuant to the protective order in this case, the Court initially filed this opinion under seal for the parties to propose redactions of confidential or proprietary information. The resulting redactions appear as asterisks enclosed in brackets, *e.g.*, "[***]." The Court also corrected a typographical error.

software-implementation services in separate solicitations.  Second, Savantage claims that the requirement that offerors demonstrate prior or current implementation experience of their software at a federal agency supporting at least 6,500 users unduly restricts competition in violation of the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253.  The plaintiff also argues that DHS prohibited Savantage from gaining the requisite implementation experience by refusing to allow Savantage to implement integrations to or interfaces with the financial-management software Savantage already provides to DHS components.

Reviewing the challenged provisions of the Request for Proposal under the applicable standards, the Court finds that it is constrained to reject Savantage's protest.  Accordingly, the Court denies the plaintiff's motion for judgment on the administrative record, denies the defendant's motion to dismiss, and grants the defendant's cross-motion for judgment on the administrative record.

I.    BACKGROUND

A.    DHS's Financial-Management-System Modernization Efforts and Prior Litigation Between Savantage and DHS

In 2002, 22 federal agencies were merged to create DHS.  At the time of the merger, each of DHS's constituent agencies had pre-existing contracts for financial-management software from a variety of vendors. These components, employing software upgrades and technology infusion to keep their systems current, continued to utilize software licenses and services under their prior contracts following the creation of DHS.  As a result, after several years, DHS found itself relying on five different vendors for financial-management software: Oracle Corporation; SAP Public Services, Inc.; Digital Systems Group, Inc.; CGI Federal Inc.; and Savantage. Indeed, even as of 2020, DHS continues to use financial-management software solutions from all five vendors across its 14 separate components. (AR 6383-85.[1])

Savantage is a women-owned small business.  It has provided, and continues to provide, DHS components with financial-management software since 2002 through licenses of the company's commercially available off-the-shelf (COTS) financial-management system, Altimate (formerly known as FFMS).  DHS holds a perpetual and enterprise-wide license to Altimate. (AR 1616.)  Altimate is currently the primary financial-management system for Immigration and Customs Enforcement (ICE), a component of DHS.  (*Id.*)  In addition, five other DHS components rely on ICE and Savantage's software to support their financial-management programs.  (AR 4845-51, 6383-6385.)  Altogether, ICE and its component customers constitute nearly 25 percent of DHS's budget.  (AR 7039.)

Since 2004, DHS has been seeking to modernize and consolidate its financial-, asset-, and procurement-management systems.  (AR 390.)  DHS first attempted a systems-modernization

---

[1] Citations to the Administrative Record (ECF 33, supplemented at ECF 39) are denoted by "AR" and followed by the page number within the Administrative Record.

effort through the launch of its Electronically Managing Enterprise Resources for Government Effectiveness and Efficiency ("eMerge2") program. The eMerge2 program sought to transition DHS's numerous financial-management programs to a Department-wide integrated system. (*Id.*) DHS was forced to abandon the program, however, in 2005, after its $52 million investment failed to produce a satisfactory system. *See Savantage v. United States*, 595 F.3d 1282, 1284 (Fed. Cir. 2010).

In November 2007, DHS issued the Transformation and Systems Consolidation ("TASC") solicitation, which sought contractor support in migrating all DHS components to financial-management software that used Oracle and SAP software baselines. (AR 390.) Savantage successfully challenged the TASC solicitation as an improper sole-source procurement outside any of CICA's exemptions to its requirement for full and open competition. *See Savantage v. United States*, 81 Fed. Cl. 300, 303 (2008) ("*Savantage I*"). This court enjoined the procurement as a result of Savantage's protest. *Id.* at 311.

Following this ruling, DHS spent 10 months conducting market research regarding the integration and implementation of financial systems in order to develop a new solicitation. In January 2009, DHS issued a new TASC solicitation. DHS sought to integrate financial-, acquisition-, and asset-management capabilities into a single software solution. This TASC solicitation required offerors to demonstrate that their software was currently operational in the federal government. Savantage challenged the new TASC solicitation, alleging that its requirement that an offeror's software already be implemented at a federal agency violated CICA, and that the requirement for an integrated solution also unduly restricted competition. *See Savantage v. United States*, 86 Fed. Cl. 700, 702, 704 (2009) ("*Savantage II*").

Savantage argued that the solicitation should be divided into two separate procurements—one to implement a core financial-management system and a second to implement and integrate feeder systems. *Id.* at 704. On this occasion, the court upheld DHS's determination of its need for integrated software already fully operational at a federal agency and approved the solicitation's use of a single, integrated system rather than two procurements. *Id.* at 705-06.

On appeal, the Court of Appeals for the Federal Circuit affirmed, finding that DHS had a rational basis for requiring the offerors be required to have an integrated, fully operational solution currently implemented in the federal government. *Savantage v. United States*, 595 F.3d 1282, 1289 (Fed. Cir. 2010) ("*Savantage III*").

Following the Federal Circuit's decision, little appears to have happened until 2013, when the Office of Management and Budget directed federal agencies to use a shared-services solution for future modernization of financial-management systems. DHS's response to that directive led to the next Savantage protests.

In March 2014, the DHS Office of Health Affairs ("OHA"), which had previously received its financial-management software support from Savantage through ICE, decided to change its invoice-payments office from ICE's finance center to the finance center of yet another DHS component, Customs and Border Protection ("CBP"). CBP's finance center uses software

3

provided by SAP.  Savantage protested this change, arguing that migrating OHA to CBP's SAP-based solution required full and open competition.  DHS took corrective action as a response to Savantage's protest and cancelled the proposed migration, rendering the protest moot.  *See Savantage v. United States*, 118 Fed. Cl. 487 (2014) *("Savantage IV")*.

Thereafter, three DHS components sharing financial-, procurement-, and asset-management services—the U.S. Coast Guard, the Transportation Security Administration, and the Domestic Nuclear Detection Office (referred to as the "TRIO components")—decided to migrate their financial-management systems to the Department of the Interior's Interior Business Center ("IBC"), a shared-services provider.  In November 2014, Savantage protested this decision, alleging that the TRIO components had failed to justify their use of other-than full and open competition when they entered into the interagency agreement with the IBC for the provision of financial-, procurement-, and asset-management services.  This court found that the administrative record contained justification for a sole-source procurement under the Federal Acquisition Regulations ("FAR") and upheld the agency's decision.  *See Savantage v. United States,* 123 Fed. Cl. 7, 37-38 (2005) ("*Savantage V*").  The Federal Circuit affirmed without opinion.  *Savantage v. United States*, 668 Fed. App'x 366 (Fed. Cir. 2016) ("*Savantage VI*").

In December 2018, DHS initiated the financial-systems modernization effort at issue in this case.  (AR 391.)  Based on market research, DHS determined that it would continue to seek a modernization and integration of its financial-, procurement-, and asset-management systems in order to meet core agency mission requirements.  (AR 226.)  DHS currently lacks seamless integration between these three systems among its various components.  Its components' systems often require contractor support to communicate between themselves.  DHS and its components are exposed to potential system failure and corrupted data.  (AR 227.)  Some DHS components rely on 30-year-old technology that "cannot be made compliant with new regulatory mandates without undergoing difficult and costly modifications."  (AR 225.)  Some DHS financial systems are at the end of their technical lifecycles.  (AR 230.)  Ultimately, DHS is concerned that a major system or data-integrity failure will occur unless it modernizes its current financial systems.  (AR 226.)  Accordingly, DHS determined that an integrated system would permit it to satisfy operational, security, and auditability standards.  (AR 399.)  DHS has concluded that the system-modernization effort would improve the speed and accuracy of financial reconciliation and reporting of consolidated financial statements, improve managerial decision-making, achieve operational efficiencies, and meet regulatory- and policy-compliance requirements.  (AR 6376.)

### B.    The EFiMS Solicitation

On October 30, 2019, DHS issued Request for Proposal #70RTAC20R00000001 ("RFP" or the "EFiMS Solicitation") for Enterprise Financial Management Software ("EFiMS").  (AR 5380.)  DHS once again seeks to obtain integrated financial-, procurement-, and asset-management software as part of its longstanding effort to modernize its financial systems.  *Id.*  To complement the EFiMS Solicitation, DHS concurrently issued a separate, companion solicitation, Request for Quotation #70RDAD19Q00000101, for an Enterprise Financial System Integrator ("EFSI") contract (the "EFSI Solicitation") to integrate the software procured under the EFiMS contract with its existing computer systems.  (AR 6823.)

4

The solicitation initially at issue in this case, the EFiMS Solicitation, anticipated the award of an Indefinite-Delivery, Indefinite-Quantity ("IDIQ") multiple award contract to provide DHS components with COTS integrated financial-, procurement-, and asset-management software.  (AR 5390.)  The RFP guaranteed a minimum award of $2,500 for the base period of performance of the contract, with an ordering period of up to 20 years and a cumulative ceiling value of $3 billion.  (*Id.*)

In the RFP,  DHS required offerors to submit proposals that clearly address all areas of the Statement of Work ("SOW").  (AR 5481.)  Section L of the RFP set forth the required Technical Proposal.  *Id.*  Factor 1, "Experience," of the Technical Proposal required offerors to demonstrate that their proposed software had "been implemented in an agency similar to DHS, i.e., the agency has a federated (i.e., an agency that has units or components with some level of autonomy) environment and that is a FAR based and/or CFO Act agency."  (AR 5482.)

Factor 2 of the Technical Proposal, "Functional Capability," required offerors to "demonstrate that the currently available software proposed meets or exceeds all functional requirements of Attachment J-3 EFiMS Requirements."  (AR 5482-83).  Factor 2 also provided that "[o]fferors shall demonstrate that the software is *capable* of supporting a large user load (target of 6,500 users or more)."  (AR 5483 (emphasis added).)  This requirement was reiterated in the SOW, which provided that the "software must be able to support a large user load (at least 6,500 users or more)."  (AR 5519.)

### C.    Savantage's Challenge to the EFiMS Solicitation

On November 25, 2019, Savantage filed this pre-award bid protest, challenging the EFiMS Solicitation on two grounds.  First, Savantage argued that the RFP was unduly restrictive of competition by limiting bids to vendors with a fully integrated financial-management system that was currently implemented at a federal agency.  Second, the plaintiff asserted that DHS's decision to procure financial-management software and software-implementation services separately, through two separate procurements, unduly restricted competition by prohibiting "total solution" bids that would offer combined licensing and implementation services.

In January 2020, the defendant moved without opposition for a voluntary remand to permit DHS to reconsider the solicitation (ECF 21), and the Court granted the motion (ECF 22).

### D.    On Remand

On remand from this Court, DHS re-evaluated its needs, resulting in the issuance of a determination and finding ("D&F") on March 31, 2020.  The D&F identified certain aspects of the original EFiMS  Solicitation that merited further review to determine whether the requirement exceeded DHS's minimum needs, including the requirement that offerors' proposed solution had to be currently implemented at a federal agency.  (AR 6639.)  DHS determined that corrective action was appropriate and decided to amend the EFiMS Solicitation.  (AR 6641.)  One change DHS made in response to the protest was to alter the requirement that offerors have currently implemented software.  DHS found that requirement exceeded its needs and changed it to allow offerors to show current or prior implementation of software at a federal agency.  (AR 6363.)

5

DHS also decided to review whether its proposed two-procurement approach exceeded its needs (AR 6639-41) and undertook further market research. The results of this market research are reflected in a May 8, 2020, updated acquisition plan. (AR 225.)

The updated acquisition plan purported to validate DHS's two-procurement approach of issuing the EFiMS and EFSI solicitations to procure software licenses and integration and management services separately. (AR 227-30.) DHS determined that its components "need maximum flexibility" due to "the disparate technology operating environments and mission requirements of each [c]omponent." (AR 227-28.) Because some DHS components already have software licenses in place (AR 392), they may not need to acquire software licenses through EFiMS but instead need only to acquire systems integration. (*Id.*) DHS provided that the two-contract approach meets this need by enabling these components to acquire the integration without bundling it with the acquisition of unnecessary software. (*Id.*)

DHS also determined that having a separate procurement for systems integration allows for independence of the integrator from the software provider, ensuring more objective advice and approaches to addressing issues. (*Id.*)

### E.   Amended EFiMS Solicitation and Amended Complaint

Following the May 2020 market-research report and updated acquisition plan, DHS took corrective action and amended its original RFP. On June 24, 2020, DHS issued Amendment 3 (AR 6258), and on July 9, 2020, it issued Amendment 4 (AR 6593) to the original RFP to finalize the EFiMS Solicitation (the "Amended EFiMS Solicitation").

Amendment 3 revised Factor 1 (Experience) of the EFiMS Solicitiation's Technical Proposal to read:

> Offerors shall demonstrate that the software proposed has been *implemented (currently or in the past)* in an agency similar to DHS, i.e., the agency has a federated (i.e., an agency that has units or components with some level of autonomy) environment and that it is a FAR based and/or Chief Financial Officers (CFO) Act agency *with at least 6,500 users*.

(AR 6363 (emphasis added).) In contrast to the EFiMS Solicitation as originally issued, which required current implementation of the software at a federal agency, the Amended EFiMS Solicitation permits offerors to demonstrate either past or current implementation experience at a federal agency similar to DHS.

As revised, the Amended EFiMS Solicitation's Technical Proposal's Factor 1 also added the requirement that an offeror have experience serving at least 6,500 users. In the original EFiMS Solicitation, Factor 1 had not required offerors to demonstrate experience with a specific number of users. (AR 5282.) The revised Factor 1 imported the 6,500-users requirement from Factor 2 of the initial EFiMS Solicitation, which had set as a target the capacity to support 6,500 users. (AR 5482-83.)

The Amended EFiMS Solicitation required offerors to submit their proposals by July 9, 2020.

On July 7, 2020, Savantage filed an amended complaint (ECF 30), alleging both that the Amended EFiMS Solicitation's implementation requirement is still unduly restrictive of competition and that the two-procurement approach is arbitrary and capricious as unduly restrictive of competition.

After amending its complaint, Savantage submitted to DHS a timely proposal. DHS reports that it received [***] proposals in response to the Amended EFiMS Solicitation. (ECF 44 at 13.) By agreement with Savantage in response to its motion for a preliminary injunction in this case, DHS has yet to review and evaluate these proposals.

The parties have cross-moved for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). The defendant also moves to dismiss a portion of the plaintiff's claims pursuant to RCFC 12(b)(1). The motions are fully briefed, and the Court heard oral argument on September 18, 2020.

## II.   JURISDICTION AND STANDING

This Court has jurisdiction over bid protests pursuant to 28 U.S.C. § 1491(b). *See, e.g.*, *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

To have standing to protest, a plaintiff must demonstrate that it is an "interested party." 28 U.S.C. § 1491(b)(1). In a pre-award bid protest such as this one, an interested party is "'(1) an actual or prospective bidder, . . . (2) that [] has a direct economic interest.'" *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015) (quoting *Digitalis Educ. Solutions, Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)).

Savantage is a prospective (in fact an actual) bidder with a direct economic interest in the procurement. *See Information Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed. Cir. 2003). Savantage alleges that but for the terms it is challenging in the Amended EFiMS Solicitation, it would have a substantial likelihood of securing the contract. *Compare Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361-63 (Fed. Cir. 2009). The defendant has not questioned Savantage's standing to maintain this suit. The Court finds Savantage is an interested party within the meaning of 28 U.S.C. § 1491(b) and has standing to maintain this action.

## III.   STANDARD OF REVIEW

On a motion to dismiss under RCFC 12(b)(1), the Court accepts as true all well-pleaded allegations in the complaint. The plaintiff bears the burden of demonstrating that the Court has jurisdiction over the claim. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998).

On a motion for judgment on the administrative record pursuant to RCFC 52.1, "'the court asks whether, given all the disputed and undisputed facts, a party has met its burden of

proof based on the evidence in the record.'" *Integral Consulting Servs., Inc. v. United States*, 140 Fed. Cl. 653, 657 (2018) (quoting *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006)).

Under RCFC 52.1, the court's review is limited to the administrative record, and the court makes findings of fact as if it were conducting a trial on a paper record. *Bannum, Inc.*, 404 F.3d at 1354. The court must determine whether a party has met its burden of proof based solely on the evidence contained within the administrative record. *Id.* at 1355. Unlike a motion for summary judgment, issues of material fact will not foreclose judgment on the administrative record. *Id.* at 1356.

The court evaluates bid protests under the Administrative Procedure Act's standard of review of agency action. 28 U.S.C. § 1491(b); *Bannum, Inc.*, 404 F.3d at 1351. An agency procurement action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706(2)(A)).

When a protester alleges that an agency's evaluation was arbitrary and capricious, this court will not disturb the agency's determination so long as there is a reasonable basis for it, even though the court might "have reached a different conclusion as to the proper administration and application of the procurement regulations" in the first instance. *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). The court may not substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

Agencies and their contracting officers are "'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). Accordingly, the court's review of a procuring agency's decision is "highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

The parties spar vigorously over the precise formulation of the standard to employ in evaluating whether the Amended EFiMS Solicitation is unduly and unlawfully restrictive of competition. The defendant cites the Federal Circuit's language from *Savantage III* that a solicitation may be unduly restrictive only when it "is so plainly unjustified as to lack a rational basis." 595 F.3d at 1286-87. The plaintiff counters that the Federal Circuit has never again used the "so plainly unjustified" test and argues for a simple rational-basis test, citing different language from *Savantage III*. *Id.* at 1285 (court must "determine whether 'the procurement official's decision lacked a rational basis'") (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)). The Court finds no meaningful distinction between the two formulations: under both approaches, the focal point is whether the agency's decision lacks "a rational basis." *Cf. Tinton Falls Lodging Realty, LLC v. United States,* 800 F.3d 1353, 1358 (Fed. Cir. 2015) (citing *Savantage III* as providing for rational-basis standard).

8

To prevail in a bid protest, the protester must show first, "a significant error in the procurement process[,]" and second, "that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996); *see also Bannum*, 404 F.3d at 1351 ("First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . [the trial court] proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.").

To establish prejudicial error, "a party must show that 'but for the error, it would have had a substantial chance of securing the contract.'" *Oracle America, Inc. v. United States,* 975 F.3d 1279, 1291 (Fed. Cir. 2020) (quoting *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009)). In pre-award protests in which an adequate factual predicate does not exist, "non-trivial competitive injury which can be redressed by judicial relief" may establish prejudice. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009). Under *Oracle*, however, when there is an "adequate factual predicate to apply the 'substantial chance' test" the court applies that test and not the "non-trivial competitive injury" test. *See Oracle*, 975 F.3d at 1291 n.3.

To obtain permanent injunctive relief, a plaintiff bears the burden of demonstrating that: (1) it is likely to prevail on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) its harm outweighs the harm to the government and third parties from the award of injunctive relief; and (4) the injunction serves the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citation omitted); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). The grant of an injunction is "extraordinary relief," and, therefore, the court applies "exacting standards." *Lermer Germany GmbH v. Lermer Corp.*, 94 F.3d 1575, 1577 (Fed. Cir. 1996). An injunction is a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

## IV.    COMPETITION IN CONTRACTING ACT AND RELATED REQUIREMENTS

CICA requires that an agency "obtain full and open competition through the use of competitive procedures" when procuring goods or services. 41 U.S.C. § 253(a)(1)(A). An agency may include in the solicitation "restrictive provisions or conditions only to the extent necessary to satisfy the needs of the agency or as authorized by law." 41 U.S.C. § 3306(a)(2)(B).

Federal procurement laws and regulations vest broad discretion in the procuring agency to determine its minimum needs. Agency officials are most familiar with the agency's needs and are in the best position to design the agency's procurement specifications. This discretion is not, however, unbounded. A procuring agency enjoys broad discretion to determine its own needs, and that determination, including any restrictive provisions, will be sustained unless unreasonable. *See Savantage III*, 595 F.3d at 1286-87.

A solicitation term may be unduly restrictive when it "is so plainly unjustified as to lack a rational basis." *Id.* The court reviews an allegation that an agency has imposed an unduly restrictive term "'to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Centech Grp., Inc. v. United States*, 554

9

F.3d at 1037 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d at 1332-33).

If "a solicitation's terms are unduly restrictive and serve no legitimate agency need, . . . the agency's decision to include those terms in the solicitation [will be held] to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Am. Safety Council v. United States*, 122 Fed. Cl. 426, 436 (2015) (citing *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997)). *See also* Cibinic, Nash & Yukins *Formation of Government Contracts* 370 (4th ed. 2011) ("An unduly restrictive specification is one that limits competition by including a requirement that exceeds the needs of the government.") (citing *Kohler Co.*, Comp. Gen. Dec. B-257162, 94-2 CPD ¶ 88).

## V.   DISCUSSION

As noted above, the plaintiff challenges the EFiMS procurement on two basic grounds. Savantage argues that DHS's decision to prohibit "total solution" bids and proceed with separate procurements of software licenses and implementation services unduly restricts competition. Savantage also argues that the Amended EFiMS Solicitation's requirement that offerors provide an integrated solution that is or has been implemented at a federal agency with at least 6,500 users is arbitrary and capricious and unduly restrictive of competition.

### A.   "Total Solution" Procurement

The Court begins its analysis with the plaintiff's challenge to DHS's decision to split the procurement and obtain separately the software and the implementation services. In effect, this challenge is a replay of the first challenge Savantage made to DHS's initial procurement more than 12 years ago, although this time the parties' positions are reversed, with the plaintiff urging a single "total solution" procurement and DHS now pursuing two separate procurements.

In procuring integrated financial-, asset-, and procurement-management software, DHS determined that it would proceed by awarding two separate contracts: the EFiMS contract procuring licenses for integrated software solutions, and the EFSI contract for data migration, implementation, and maintenance services. Savantage challenges DHS's decision to issue two solicitations, rather than permitting offerors to submit a bid offering a "total solution" that would include both software licenses and implementation services.

Savantage argues that the "total solution" model it wants DHS to pursue would allow it and other offerors to offer price discounts in providing both functionalities. Savantage also argues that the "total solution" approach would reduce the risk of failure because one entity would be responsible for updating the software and fully servicing it through technology enhancements. In contrast, Savantage argues, a dual-vendor model requires coordination between the two vendors, which could lead to increased costs and delays. Combining these points, Savantage asserts that the separate procurements unduly restrict competition from small businesses; were DHS to permit a single "total solution" procurement, small businesses could offer more competitive pricing. Splitting the procurement into two separate contracts, Savantage claims, provides a competitive advantage to large software vendors that do not provide holistic

software and integration services and instead rely on a network of systems-integration firms with which they partner. It argues that DHS's approach contradicts the agency's stated desire to rely on fewer systems and vendors.

For its part, DHS argues that based on its market research it determined that procuring software licenses and implementation services separately serves two functions. First, separate procurements provide maximum flexibility to DHS components to accommodate the "disparate technology operating environments and mission requirements" of each component (AR 227-28); such flexibility is needed because some DHS components already have software licenses in place. (*Id.*) Second, splitting the two procurements will give to systems integrators a beneficial level of independence. (AR 229.) DHS determined that, if the systems integrator is the same as the software provider, the systems integrator may provide recommendations, approaches, or solutions that are not as objective or independent as those DHS would receive from a systems integrator without its own software product. (AR 392.) As a result of these two justifications, DHS determined that separate procurements splitting the acquisition of software from the acquisition of implementation services is the best course of action.

An agency's decision regarding the number and structure of its procurements is subject to the same rational-basis review as other agency decision-making: when there is no rational basis for an agency's decision, or there was a violation of an applicable regulation or procedure, a court may find that decision to be arbitrary and capricious. *CHE Consulting, Inc. v. United States*, 74 Fed. Cl. 742, 746-47 (2006).

The plaintiff has previously challenged DHS's determination of whether to pursue procurement through one or multiple contract instruments. *Savantage III*, 595 F.3d at 1286-87. In protesting the TASC solicitation, Savantage argued that DHS had no justification for seeking an already-integrated solution, as opposed to using two procurements, one to implement initially a core financial system, and then a second separately to integrate and implement feeder asset- and procurement-management systems. *Id.* The Federal Circuit found that "[o]n a question such as whether to implement a pre-integrated system or to build a system by beginning with a core financial system and then integrating other systems afterwards, an agency's preferences are entitled to great weight." *Id.* at 1286.

Savantage tries to distinguish *Savantage III* in part by arguing that in the earlier case the Federal Circuit sustained DHS's decision to seek a single, integrated financial-management system, whereas in this case DHS has adopted the approach Savantage urged in its challenge of the TASC procurement. That distinction makes no difference to the ultimate outcome, although it does require the Court to undertake an analysis of the administrative record in this case and not simply find that the decision in *Savantage III,* on its own terms, resolves this protest, as the defendant argues.

In this case, as in *Savantage III*, the administrative record before the Court establishes a rationale for DHS's current approach to procure licenses and implementation services separately. DHS cites the need for flexibility and independence between the successful bidders, which a single, "total solution" procurement would not provide. DHS has presented a rational basis for

11

its two-contract procurement approach challenged by the plaintiff, and its choice is "entitled to great weight." *Id.*

In addition, as the Government Accountability Office ("GAO") has found, the two-contract approach has the effect of increasing competition by enabling more offerors to compete for two separate contracts targeting different sets of expertise and experience.[2] *See, e.g., C3.ai, Inc.*, B-418676, 2020 CPD ¶ 256, 2020 WL 4569173, at *6 (Comp. Gen. July 28, 2020) ("When an agency seeks to procure separate and multiple requirements under a single contract, there is potential for restricting competition by excluding firms that furnish only a portion of the requirement; we therefore review challenges to such solicitations to determine whether the approach is reasonably required to satisfy the agency's needs."); *see also Hughes Missile Sys. Co.*, B-257627, 94-2 CPD ¶ 256, 1994 WL 714977, at *11 (Comp. Gen. Dec. 21, 1994) ("Since the purpose of our bid protest function is to ensure that agencies obtain full and open competition to the maximum extent practicable, we will generally favor otherwise proper actions—like this one—which are taken to increase competition."); *Waste Mgmt. of Greater Washington*, B-237928, 89-2 CPD ¶ 559, 1989 WL 241497, at *1 (Comp. Gen. Dec. 15, 1989) ("The purpose of our bid protest function is to ensure that full and open competition is obtained to the maximum extent practicable and we will not consider a protest that an agency's actions allowed greater competition.").

DHS determined that dividing this procurement into separate contracts for software licenses and implementation services would provide more opportunities for novel, objective solutions than if a single offeror proposed a "total solution." Rather than restricting competition, DHS's goal of independence between software provider and integrator leaves room for more offerors, which can reasonably be said to "increase competition."

The Court rejects the plaintiff's challenge to DHS's decision to proceed with two distinct procurements instead of a single, "total solution" procurement.

## B. Implementation of Integrated Software at an Agency Similar to DHS With at Least 6,500 Users

Factor 1 of the Technical Proposals of the Amended EFiMS Solicitation addresses offerors' prior experience with software implementation at a large federal agency, providing:

> Offerors shall demonstrate that the software proposed has been *implemented (currently or in the past)* in an agency similar to DHS, i.e., the agency has a federated (i.e., an agency that has units or components with some level of autonomy) environment and that it

---

[2] Decisions by the GAO in bid protests may be cited as persuasive authority, even though they are not precedential or binding on this court. *See Centerra Grp., LLC v. United States*, 138 Fed. Cl. 497, 414 (2018).

is a FAR based and/or Chief Financial Officers (CFO) Act agency *with at least 6,500 users*.

(AR 6363 (emphasis added).)

Savantage challenges the requirement that offerors show 1) prior or current implementation at a large multi-component federal agency 2) with at least 6,500 users of 3) financial-management software integrated with asset- and procurement-management systems. The plaintiff claims these requirements, in combination and individually, are arbitrary and capricious.  Savantage asserts that it "can comply with the requirement to bid and deliver an integrated software solution consistent with the requirements of the procurement."  (ECF 43-1 at 23.)  It argues, however, that DHS has "ensured, over time, that Savantage cannot competitively meet the arbitrary and unduly restrictive requirement that the proposed integrated software already be fully implemented."  (*Id.*)

### 1.      Prior or Current Implementation

The parties dispute whether DHS has a rational basis for requiring current or prior implementation experience of any proposed software, when, Savantage argues, DHS could meet its needs by simply requiring offerors to demonstrate their system's capacity to serve the agency.

As noted above at 9, in evaluating a solicitation requirement, the Court looks to whether the agency action "lacked a rational basis," *Savantage III*, 595 F.3d at 1286-87, reviewing allegations of unduly restrictive terms "'to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'"  *Centech Grp., Inc., v. United States*, 554 F.3d at 1037 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d at 1332-33).  The Court's review is ultimately deferential, and "determining the agency's minimum needs is a matter that falls within the broad discretion of the agency – and not a matter of the Court to second guess.  *Parcel 49C Ltd. P'ship v. United States*, 130 Fed. Cl. 109, 126 (2016).

The Federal Circuit previously reviewed a similar implementation requirement when DHS sought integrated financial-management software under the TASC contract.  *Savantage III*, 595 F.3d at 1286-87.  In the earlier case, Savantage challenged the TASC RFP's requirement that the integrated financial-, asset-, and procurement-management software be fully operational in the federal government.  The Federal Circuit found that:

> DHS's requirement that the financial management, asset, and acquisition system be currently fully operational cannot be considered unreasonable. Having already failed to build an operational system from the ground up, DHS could reasonably prefer a system that is already operating successfully. Savantage's contention that a pre-integrated system is difficult to implement supports DHS's decision to require a system that has been shown to work.

13

*Id.* at 1287.

The Federal Circuit found that DHS had presented an adequate justification for seeking integrated software already operational in the federal government, and that there was "nothing unreasonable in the means DHS ha[d] devised to improve its likelihood of success in obtaining the agency-wide financial system." *Id.* at 1288.  The Federal Circuit rejected Savantage's challenge to the implementation requirement of the TASC solicitation.  *Id.* at 1287-88.

Here, Savantage challenges the Amended EFiMS Solicitation's requirement that any offeror's proposed integrated software is or has been implemented at a federal government agency.  Contrary to Savantage's position, however, the Court finds that DHS had a rational basis for the requirement that the software be or have been implemented at a federal agency.

Savantage argues that the requirement that offerors have prior or current experience with the implementation of their software at a large federal agency disadvantages potential or actual offerors that could meet DHS's stated needs even in the absence of such experience.  Savantage suggests that in order to achieve the goal of ensuring offerors can deliver a satisfactory integrated financial-management system, DHS could allow an offeror to demonstrate its system's capabilities and scalability instead of requiring prior implementation.  During oral argument, Savantage noted that its software has been successfully implemented at the Departments of Housing and Urban Development ("HUD") and Veterans Affairs ("VA").  (Oral Arg. Tr. (ECF 65) at 11 (HUD); *id*. at 22-23 (VA).)  Because the implementation of Savantage's software at these agencies did not include experience with the specific integrations DHS is requiring, however, Savantage acknowledges it cannot meet the RFP's implementation requirements.  The plaintiff contends that the focus on past implementation over capability is therefore unduly restrictive.

DHS argues that requiring offerors to demonstrate they have experience implementing integrated software at a large federal agency is rationally related to its goals for the EFiMS procurement.  DHS posits that such prior experience increases the likelihood that the solutions proposed in response to the RFP will be successful.  (AR 238.)  After conducting market research, DHS noted in its updated acquisition plan the complexity of its business requirements, the challenging operational environment of supporting a large, multi-component agency, and the need for accuracy given the high visibility of its nationwide programs.  (*Id.*)  DHS therefore determined that implementation experience was necessary to ensure the success of its new mission critical, agency-wide financial-, asset-, and procurement-management systems.  (AR 238, 399.)

The defendant notes that the administrative record supports DHS's stated justification that offerors' software solutions have a demonstrated history of handling complex transactions in the context of a federal agency.  (AR 238, 399.)  It is entirely rational and appropriate, DHS argues, for an agency to demand successful implementation and not a promise to implement successfully from offerors.  *See Savantage III,* 595 F.3d at 1287.  The critical nature of DHS's functions and the essential role the new integrated software system will play in supporting its operations, DHS continues, reasonably supports the stated need for a system already proven

14

successful.  The requirement for prior experience may therefore reasonably support the inference that such software is more likely to be implemented successfully at DHS.

The plaintiff counters that prior or current success at one agency does not guarantee success at DHS, and other experience could substitute for implementation at a federal agency.

There is little doubt that a requirement that offerors demonstrate prior experience at a government agency restricts competition to a set of incumbent providers of like services to federal agencies.  In that manner, it may limit innovation and increase costs.  Additionally, procuring agencies separately review and evaluate as part of the procurement process offerors' past performance, making the requirement to show previous experience redundant in an important respect.

Both sides present reasonable and consistent positions.  The plaintiff accurately advances the position that the requirement restricts competition.  The question is whether the restriction is reasonable.  On that point, the Court acknowledges it faces a close call.  Ultimately, the Court must defer to the agency's approach if the record supports it.  In this case, the record does.  The issue may come down to how closely the Court must scrutinize the record.  As noted above, the record provides DHS's explanation for the decision to require prior (or current) implementation experience.  The explanation does not appear in this instance to reflect boiler-plate language; rather, it appears to be a measured decision by DHS.  It is a decision that may reasonably be called into question, because of its restrictive impact on potential offerors and the separate evaluation of past performance DHS will otherwise undertake in evaluating the offers it receives.

The Court finds that the deferential standard of review compels a rejection of Savantage's position.  The discretion vested in DHS is broad, and in this case the record contains an adequate explanation for the agency's exercise of that discretion.

Conjuring an alternative and relying on it seek to overturn DHS's choice to require prior implementation experience is the same approach Savantage took in its earlier protest, and the Federal Circuit rejected that approach a decade ago.  *Id.* at 1288.  For similar reasons, in this procurement, the requirement is within the agency's broad discretion to determine, reasonable, and supported in the record.

Just as with the Federal Circuit's previous upholding of a similar implementation requirement in the TASC solicitation, DHS has asserted a rational basis for requiring prior or current implementation of offerors' software, and that rational basis is supported in the administrative record.  The Court rejects Savantage's claim that the implementation requirement is arbitrary and capricious.

## 2.    DHS's Failure to Allow Savantage to Install Software Interfaces

Savantage challenges the requirement that offerors must demonstrate that their software implemented at a federal agency be integrated.  The plaintiff asserts that DHS refused to allow Savantage to "integrate" its financial-management software, Altimate, with the asset- and procurement-management systems functioning at ICE and its DHS-component customers.

Savantage claims that had it been allowed to integrate Altimate with asset- and procurement-management software, as Savantage proposed to DHS on several occasions, it could meet the Amended EFiMS Solicitation's experiential requirements. Its inability to meet the requirements, Savantage argues, is due entirely to DHS. Having prevented Savantage from obtaining the relevant experience, Savantage argues, DHS should not be allowed to establish terms it knows Savantage cannot meet due to DHS's own actions.

As noted above, since 2002, Savantage has provided DHS components with Altimate, its COTS financial-management software program. In 2005, DHS issued Savantage a task order to develop an interface enabling Altimate to communicate directly with PRISM, DHS's procurement-management system. (AR 7075-76). Savantage completed the interface design, but DHS never deployed it. (AR 7133.) In 2017, Savantage responded to a request from DHS to develop an interface to allow Altimate to interact with PRISM. (AR 7079.) Once again DHS did not proceed with the interface between the two systems, apparently because it did not receive funding (AR 7195, 7198, 7201, 7204), even though DHS did develop interfaces for PRISM with the financial-management software deployed by other DHS components. (AR 2310.) In 2018, DHS considered for the third time an interface between Altimate and PRISM, but the project did not move forward. (AR 7231, 7237.)

According to Savantage, Altimate is integrated with its own asset-management module, fulfilling that requirement of the Amended EFiMS Solicitation, but DHS has declined to implement that integration at any of its components, even though it would not cost DHS any additional licensing fees. (ECF 30-7 at ¶ 12.[3]) In addition to not using Altimate's asset-management module, DHS has never requested that Savantage develop an interface between Altimate and Sunflower, the asset-management tool widely used among DHS components (*id.* at ¶¶ 13-14), despite Savantage's expression of interest and ability to create an interface between the two systems. (AR 7041.)

Savantage notes that Altimate is currently integrated with DHS's business-intelligence software. This business-intelligence software has become obsolete and been designated as "end of life" by DHS. (ECF 30-7 at ¶ 20; AR 954.) Savantage claims that DHS is relying on Altimate's integration with the obsolete business-intelligence tool to find Altimate deficient, but Savantage blames DHS for the failure to keep its business-intelligence tool updated.

Savantage argues that DHS's refusals to allow an interface between Altimate and PRISM or to move forward with any other Altimate interfaces are arbitrary and capricious and had no

---

[3] Exhibit 6 to the Amended Complaint (ECF 30-7) is the Declaration of Lisa R. Kazor, the president and chief executive officer of Savantage. Concurrent with its motion for judgment on the administrative record, the plaintiff moved to supplement the administrative record. (ECF 41.) Among the materials the plaintiff sought to include in the administrative record was Ms. Kazor's declaration. Following oral argument, the Court granted in part and denied in part the plaintiff's motion to supplement the administrative record and approved the inclusion of Ms. Kazor's declaration in the administrative record. (ECF 63.)

rational basis.  Savantage asserts that DHS itself has prevented the company from gaining the experience required to satisfy the terms of the Amended EFiMS Solicitation.  Savantage also questions DHS's need for integrated software when DHS failed to interface Altimate with DHS's other software over the course of 15 years.  Savantage argues these factors make the requirement for integrated software arbitrary and capricious.

DHS counters first that Savantage's challenges to DHS's refusal to allow an interface between Altimate and other DHS software systems present questions of contract administration under the Contract Disputes Act and are outside the Court's bid-protest jurisdiction. Accordingly, the defendant moves to dismiss this portion of the plaintiff's challenge.

The Court rejects the motion to dismiss.  Although the Court does not have jurisdiction to consider DHS's administration of its contracts with Savantage under 28 U.S.C. § 1491(b), the plaintiff does not ask the Court to do so.[4]  Savantage argues instead that DHS's actions under its contracts with Savantage go to the question of whether DHS has intentionally developed requirements in the Amended EFiMS Solicitation knowing that Savantage cannot meet them. The plaintiff's line of attack goes to the nature of this procurement and not DHS's administration of its contracts with Savantage.  The plaintiff also employs its history with DHS to seek implicitly to undermine the presumption of good faith that normally applies to an agency's actions without in fact alleging bad faith by DHS.  The plaintiff has met its burden of showing the Court has jurisdiction to entertain this claim, as construed by the Court.

On the merits, DHS defends the terms of the Amended EFiMS Solicitation by arguing that Savantage was denied the ability to build an interface between Altimate and the other DHS systems and not to integrate the systems.  The Amended EFiMS Solicitation calls for an integrated system, not one that contains interfaces between distinct systems.  DHS argues that its refusals to allow Savantage to install interfaces between Altimate and DHS's other systems is irrelevant to the requirement that offerors propose integrated systems.  Even if DHS had allowed Savantage to proceed with its interfaces, Savantage would still not have the experience with an integrated system as required by the Amended EFiMS Solicitation.

Savantage responds in two ways.  First, it argues that throughout the record DHS itself uses "integrate" and "interface" synonymously, so that the requirement of the Amended EFiMS Solicitation for an integrated system and for offerors to have provided integrated systems can be met by its interface efforts.  Second, Savantage also argues that its 2017 effort to connect Altimate with PRISM was a proposed integration and not an interface.  Even if the latter is

---

[4] To the extent that the plaintiff's briefs can be read to seek the Court's review to determine whether DHS acted lawfully with respect to its decisions regarding the proposed interfaces, the Court agrees with the defendant that it may not do so in the context of this bid protest. Accordingly, the Court interprets the plaintiff's arguments in the manner most consistent with the exercise of jurisdiction over the plaintiff's bid protest.

correct, the record reflects that the 2017 effort was derailed by a lack of funding, something that is a routine risk for agencies and their contractors.

An interface enables two distinct systems to communicate directly with each other. An integrated system is a single system. In its market research, DHS distinguished between the two. An "integrated" system combines various distinct functionalities into a unified system within which processes are seamless and all information is contained within a single database. (AR 398.) An "interfaced" system consists of separate functional systems linked together to enable the transfer of information otherwise contained in separate databases. (*Id.*)

The Amended EFiMS Solicitation makes a similar distinction. It defines "integrated" as:

> Connection between two or more software modules, typically part of the same system. Connectivity is transparent to end users and maintained as part of a software offering. The system is considered tightly coupled. There is no software development required to build these connections and they do not require operations and maintenance support under a sustainment contract. Updates are provided by the OEM vendor.

(AR 6412.)

By contrast, "interfaced" is defined in the Amended EFiMS Solicitation as:

> Connection between two or more software systems used to synchronize information. The systems involved are loosely coupled and the interfaces may require ongoing maintenance to support changes to the underlying systems. Data is typically stored in multiple systems. These connections are often custom created during the software implementation and may require ongoing operations and maintenance support under a sustainment contract.

(*Id.*)

DHS has decided to deploy an integrated system. (AR 6364.) The fact that Savantage can show (ECF 50 at 13-15) in the record instances in which DHS itself uses "integrated" and "interface" as synonyms is not relevant either to the actual terms of the Amended EFiMS Solicitation or to DHS's decision to proceed with an integrated system. Once that decision is made, the confusion reflected in the record becomes irrelevant when the Amended EFiMS Solicitation itself does not reflect that confusion, and the approach it reflects is supported by the record, as it is here.

"[D]etermining an agency's minimum need 'is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess.'" *Savantage III*, 595 F.3d at 1286 (quoting *Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 (2004)). The Federal Circuit already held in *Savantage III* that DHS's decision to pursue an integrated solution was

reasonable in 2010.  595 F.3d at 1286.  That decision remains reasonable on the record before the Court.

To the extent that the plaintiff advances its argument regarding DHS's rejection of interfaces between Altimate and other DHS systems to imply that agency officials are acting in bad faith, the Court rejects the inference.  The plaintiff makes no such explicit claim.  The Court will not infer a claim of bad faith unless the protester makes its claim explicitly and not by innuendo.  Were the Court to consider the claim, it would fail on this administrative record.  A protester must prove that the government acted with specific intent to injure it to overcome the presumption that government officials act in good faith, *id.* at 1288, in order to prevail on a claim that agency officials acted in bad faith.  *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  The record is devoid of any such evidence here.

Because Savantage does not make, and the Court would in this case reject, any argument that DHS acted in bad faith in its treatment of the plaintiff's proposals to create interfaces between Altimate and other DHS systems, the status quo remains: Savantage cannot show, as it stands, that it has installed the requisite integrations with other DHS systems to compete for the contract.

DHS's decision to require an integrated system, which is supported by the record and within DHS's discretion, had a rational basis.  That decision to require an integrated system supports the conclusion that DHS's treatment of Savantage's proposals to create interfaces between Altimate and other DHS systems in the past is irrelevant to the content of the Amended EFiMS Solicitation.  The Court rejects the plaintiff's claim.

### 3.    Requirement of 6,500 Users

Savantage challenges the Amended EFiMS Solicitation's requirement that offerors have current or prior implementation experience at an agency with 6,500 or more users. The plaintiff asserts that a 6,500-users requirement is unduly restrictive of competition and lacks a rational basis without more support in the record for how and why DHS calculated the 6,500-users figure.

Factor 1, the Experience provision, of the initial EFiMS Solicitation's Technical Proposal requirements read in relevant part:

> Offerors shall demonstrate that the software proposed has been implemented in an agency similar to DHS, i.e., the agency has a federated (i.e., an agency that has units or components with some level of autonomy) environment and that it is a FAR based and/or CFO Act agency.

(AR 5482.)

Factor 2, the Functional Capability requirement, of the initial EFiMS Solicitation's Technical Proposal, read:

19

> Offerors shall *demonstrate* that the software is *capable* of
> supporting a large user load (*target* of 6,500 users or more).

(AR 5482-83 (emphasis added).)

On remand, DHS re-evaluated the terms of the initial EFiMS Solicitation. The initial EFiMS Solicitation had required offerors to describe their software's capacity to support heavy user-loads. The Amended EFiMS Solicitation left Factor 2 unchanged but, as noted, included new language in Factor 1, the Experience provision, of the Technical Proposal:

> Offerors shall demonstrate that the software proposed has been
> implemented (*currently or in the past*) in an agency similar to DHS,
> i.e., the agency has a federated (i.e., an agency that has units or
> components with some level of autonomy) environment and that it
> is a FAR based and/or Chief Financial Officers (CFO) Act agency
> *with at least 6,500 users*.

(AR 6363 (emphasis added).) Factor 1 of the Technical Proposal, dealing with offerors' experience, now requires offerors to demonstrate that their software supports or has supported 6,500 users, rather than merely demonstrating the capacity to do so.

The plaintiff's challenge to the numerical floor of the amended Factor 1 as unduly restrictive of competition prompts two distinct issues.

First, Savantage argues that DHS lacks a rational basis for requiring 6,500 users. Savantage points out, and DHS concedes, that the administrative record lacks any documentation supporting the decision to amend the Solicitation to include a 6,500-users threshold requirement. Savantage notes that only two current software providers at DHS can meet the 6,500-users threshold.[5] Any attempt by DHS to offer justification for the figure in its briefing, Savantage contends, constitutes an impermissible *post hoc* rationalization. Lacking support in the record, the requirement cannot be upheld, Savantage contends.

In response, DHS frames the 6,500-users requirement as a rational choice given its need for the software to support a large user-load. Citing *Savantage III*, DHS rejects the plaintiff's suggestion that there must be specific support in the administrative record pointing to the explicit need for 6,500 users. 595 F.3d at 1287 (DHS is "not required to synthesize its thinking and its market research into a prelitigation written explanation of the rationale for each of the

---

[5] Savantage's briefs do not explain how DHS received [***] proposals (including the plaintiff's) in response to the Amended EFiMS Solicitation. During oral argument, the plaintiff argued that the number of offers DHS received is deceptive because some of the offerors are probably "channel partners" of Oracle and SAP. (Oral Arg. Tr. (ECF 65) at 65-66.) The number of proposals received by DHS for the Amended EFiMS Solicitation does not, perforce, demonstrate that the plaintiff's concern is misplaced, but it suggests that the concern at this stage of the procurement may be overblown.

20

solicitation requirements"). Instead, DHS argues that it may choose its baseline requirement so long as there is a rational basis for that requirement generally.

Second, the parties dispute whether Savantage has been harmed by the 6,500-users requirement. Savantage maintains that it is unable to comply with the 6,500-users requirement as written because its Altimate software currently supports only 3,042 users at ICE and its five DHS customer components that utilize that financial-management software. Savantage argues that its software can support heavy user-loads, but Savantage cannot point to experience in which its software supports 6,500 users. DHS argues that because the plaintiff submitted a proposal suggesting it can meet the 6,500-users requirement, however, it is unable to show prejudice.

Agencies are required to "develop specifications in the manner necessary to obtain full and open competition with due regard to the nature of the property or services to be acquired." 41 U.S.C. § 3306(a)(1)(C). While "[t]he determination of an agency's minimum needs 'is a matter within the broad discretion of agency officials,' where there is no rational basis for an agency's decision, or there was a violation of an applicable regulation or procedure, the Court may find such decision to be arbitrary and capricious." *CHE Consulting, Inc. v. United States*, 74 Fed. Cl. 742, 746-47 (2006) (quoting *Wit Assocs., Inc. v. United State*s, 62 Fed. Cl. at 662). *Post hoc* rationales should not form the basis of agency decision-making. "Any post hoc rationales an agency provides for its decision are not to be considered." *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 376 (2010) (quoting *Gen. Elec. Co. v. Dept. of Air Force*, 648 F.Supp.2d 95, 100 (D.D.C. 2009)); *see also Kiewit Infrastructure West Co. v. United States*, 147 Fed. Cl. 700, 711 (2020).

The Court is skeptical of the merits of the defendant's position. The record supports DHS's need for software to support a large user-load, and a target of 6,500 users, as was contained in Factor 2 of the Technical Proposal requirements of the initial EFiMS Solicitation, could well have been supported on the record. A firm floor of requiring at least 6,500 users is different. Any firm number is often, to some extent, arbitrary. As a result, an agency's use of a precise number as a floor for offerors to satisfy merits special attention to ensure a rational explanation in the record because of the many questions arising from its use and the potential to disadvantage arbitrarily otherwise eligible offerors. For example, what if an offeror could only show 6,499 users? What is the distinction between 6,500 users and 6,000 users? How many users does DHS expect the software to have to support? Will the number of users grow over time, remain the same, or shrink? The record is silent on these issues, as it is on why the 6,500-users number was selected. There is no basis to determine whether 6,500 users constitute a large user-load, how that user-load compares with DHS's total user-load, or how it compares with user-loads at other large federal agencies.

The Court's skepticism regarding the validity of the number of users contained in the Amended EFiMS Solicitation is deepened by the fact that DHS itself appeared not to know how many users Savantage's software currently supports at its own agency. DHS's opening brief on the cross-motions for judgment on the administrative record argued that Savantage met the 6,500-users threshold based on the number of users it currently has at DHS. (ECF 44 at 24, n. 3.) Its own calculation turned out to be incorrect, as the plaintiff explained in its reply brief. (ECF 50 at 21-22.)

The defendant argues that its decision to include the 6,500-users threshold in the Amended EFiMS Solicitation was prompted by Savantage's initial complaint in this case, which challenged ambiguities in the initial EFiMS Solicitation and sought clarification. The reason DHS turned a target into a requirement is not important; what is important is whether that requirement is supported by the record. In this instance, the specific number is not.

The defendant argues that the record does support the requirement of 6,500 users. The record indicates that only four groupings of components require software modernization. DHS argues, citing *Bowman Transportation v. Arkansas-Best Freight Systems, Inc.*, that courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," and the administrative record adequately supports the 6,500-users requirement, so it does not need to show an explicit justification for that number. (ECF 59 at 8 (quoting 419 U.S. at 286).)

This argument by the defendant could support using 6,500 users as a target, but as a hard-and-fast threshold, the citation to *Bowman Transportation* proves too much. As the record now stands, the 6,500-users threshold seems at best an approximation; the record contains no actual data or calculations to support it. While an agency may not have to support its selection of any specific number, there must be more in the record to support a number like the 6,500 users at issue in this case than there is here.

Ultimately, the Court declines to reach the issue of whether the 6,500-users requirement is arbitrary and capricious. Even if it is, the Court finds that Savantage is unable to demonstrate prejudice.

The Court has rejected Savantage's arguments that the prior-implementation requirement is arbitrary and capricious or not supported by the administrative record. Savantage acknowledges that it cannot satisfy the Amended EFiMS Solicitation's prior-implementation requirement. (ECF 43-1 at 23 ("Savantage cannot competitively meet the arbitrary and unduly restrictive requirement that the proposed integrated software already be fully implemented").) Having conceded that it does not satisfy a separate requirement of the Amended EFiMS Solicitation, Savantage is unable to demonstrate that it is prejudiced by the 6,500-users requirement. If the Court were to strike the 6,500-users requirement (or remand to require DHS to remove it), there is no reason to believe that DHS would otherwise revise the Amended EFiMS Solicitation to remove or revise the prior-implementation requirement. In fact, the history here suggests just the opposite.

The prior-implementation requirement that Savantage is unable to satisfy was in the initial EFiMS Solicitation. (AR 5482.) DHS had the opportunity to revise that requirement when it requested that the matter be remanded for consideration of corrective action in response to Savantage's original complaint. Upon further consideration, DHS did not revise that requirement in the Amended EFiMS Solicitation. (AR 6363.) On this record, the Court cannot predict that, were it to remand to DHS to remove the additional requirement for 6,500 users, DHS would take the opportunity to make additional revisions to the Amended EFiMS Solicitation that would make Savantage eligible.

Against the specific factual background that produced the Amended EFiMS Solicitation that is the subject of this pre-award protest, the likelihood is that any revised solicitation would again preserve the prior-implementation requirement.  Savantage would still have to concede that it would not be able to meet that prior-implementation requirement, which this Court has upheld.

As a result, the Court finds that the plaintiff cannot meet its burden to demonstrate that it has suffered any prejudice due to the 6,500-users requirement.  Under *Oracle*, the Federal Circuit's most recent decision regarding the prejudice a protestor must show in a pre-award protest, an offeror must establish a prejudicial error in the procurement process by showing that "'but for the error, it would have had a substantial chance of securing the contract.'" *Oracle*, 975 F.3d at 1291 (quoting *Labatt Food Serv., Inc., v. United* States, 577 F.3d 1375, 1378 (Fed. Cir. 2009)).

The Court understands that the standard adopted by the Federal Circuit in *Oracle* to demonstrate prejudice in a pre-award bid protest is a novel one.  As a result, its applicability is uncertain, and the occasions when it will be the appropriate test, as opposed to the test of *Weeks Marine*, will require further development.

The Court finds that this case presents an appropriate factual basis to support the application of the *Oracle* test for showing prejudice because the record is sufficiently developed to permit the Court to conclude that DHS would not revise the EFiMS solicitation on a further remand to remove the prior-implementation requirement that, Savantage has conceded, it cannot meet.  As a result, Savantage cannot demonstrate that it would have "a substantial chance" of being awarded the EFiMS contract were the Court to enjoin the procurement based on its inclusion of the 6,500-users requirement.

On the facts before the Court, the *Oracle* test is applicable, and under that test, Savantage is unable to demonstrate that it is prejudiced by the 6,500-users requirement in the Amended EFiMS Solicitation.  Accordingly, the Court rejects this aspect of the plaintiff's challenge.

## VI.   CONCLUSION

Savantage makes several arguments in its briefing that go to aspects of its core challenges addressed above.  The Court has considered these arguments, even if they are not specifically addressed in this decision, and rejects them or finds they are not determinative.

The Court upholds the decision to proceed with a two-contract model rather than a single procurement for the software and services DHS is seeking to acquire.  As for the terms of the Amended EFiMS Solicitation, the Court has found that DHS has a rational basis for requiring offerors to have current or previous experience implementing their integrated software at a large federal agency.  In light of that requirement, the Court declines to reach the question of whether the requirement that offerors' software supports or has supported at least 6,500 users at the agency at which their software is or has been deployed because the Court determines that Savantage cannot satisfy the threshold required to demonstrate prejudice.

Given the determination that the plaintiff cannot prevail on the merits, the Court denies its request to enjoin the procurement from going forward.  The Court will issue an order in accordance with this decision.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**